Thank you, your honors. Good morning. May it please the court, Alejandro Garcia for Petitioner Patricia Mendoza. Your honors, in this case, I think it's very, very important to take a look at the big picture in this case. So what is the issue in this case? The issue in this case is what a lawful permanent resident of the United States has to do to confront and cross-examine the government witnesses. When she is accused of alien smuggling, which is the most serious immigration charge out there. It is a lifetime permanent ban from the United States. So when she alleges duress and coercion by these government officers, what does she have to do to confront and cross-examine them? So the first thing that happens is, first of all, she has to travel six times from the LA area to the immigration court in San Diego. Why? Because that's where the government witnesses are located. If the incident happens at a port of entry in San Ysidro, then you stay at the San Diego immigration court. And again, it's for government witnesses. So then what does she have to do? She has to file a declaration alleging the duress and coercion. But mind you, she is not given a Spanish version of her interview, of any notes of her statements. She's not given the Spanish version of those. She's not given an audio recording of the interviews. She's not given a video recording of the interviews. And she is not given any discovery whatsoever from her husband, who was the driver of the vehicle alleged in the incident. So she's not given any of that and she must file a declaration. So you file a declaration alleging the duress and coercion. Now, does that give you the opportunity to confront and cross-examine the government witnesses? No. What that entitles you, if the immigration judge finds that you've made out a prima facie case of duress and coercion in your declaration, that only entitles you to a suppression hearing. So once you get to the suppression hearing, are you entitled then to confront and cross-examine the government officers? No. Why? Because you, the lawful permanent resident of the United States, is the first witness called. So the government calls you as the first witness. The accused is the first one subject to cross-examination by government attorneys. And mind you, in this case, there is, so the question becomes, do you testify or not when you are the first witness called? So you don't get to call the government officers as the first witnesses. You are the first witness called. So then the decision you have to make is whether you testify or invoke your Fifth Amendment privilege against self-incrimination. In this case, Ms. Mendoza was not offered any immunity to prosecution. She was still within the five-year statute of limitations on an 80-year smuggling criminal charge. So she had to decide whether she testifies or not. So let's assume that you take the risk and you do testify. So you testify. You're subject to cross-examination from the government attorneys. And then what happens? You finish testifying. And then at that point, are you entitled to confront and cross-examine government officers? No. Why? Because the government can make a motion for summary judgment to the immigration judge. And if the immigration judge finds you're not credible or finds that the documents are more credible than your testimony, the government can then rest. Can then rest their case, let the documents be admitted, and you're found removable. And so even at that point, you're still not credible. My understanding was that the government had the agents ready to testify, but they didn't call the agents because she did not testify. And it's not clear to me what she would have included. OK, I was there. And that's what they say in their moving papers. But the officers were not there. I'll tell you personally, they were not there in the January 2012 hearing, and they were not there in the October 2014 hearing. So, yes, that's what they say. We're going to call her as the first witness. We're going to call the husband as the second witness. And if you get through that hurdle, then we'll have the officers ready to testify. But I guarantee you, and I don't know if this is on the record, they were not there to testify. I was physically there in the courtroom and they were not there. But counsel, counsel, how do we know they just weren't waiting in a conference room outside the courtroom? I mean, normally you don't have witnesses wait in the courtroom. You normally have them wait outside the courtroom. So, I mean, I don't think we can really make heads or tails out of that. That's a that's a decent fair point, Judge. But I've been doing this 25 years and I guarantee you they were not there. But that's that's you know, I can't prove it, but they can't prove that they were there either. So so again, so even if you testify, if the judge they can they can rest, they can let the the the judge make a credible determination. And they find you not credible, you know, as compared to government officers, then the case ends there. You're still not guaranteed the ability to confront and cause examine the officers. So in my opinion, that is a clear violation of due process. I, I, I know it when I see it. So what happened in our case? In our case, we filed the declaration. We made the prima facie case of duress and coercion in the declaration. I think the government argues that we may have not done that, but it's very clear based on the August 1st, 2013 BIA decision that we made the prima facie case of duress and coercion on the declaration itself. When the case was remanded to the immigration judge, he noted that on the record at the hearing on December 5th, 2013. He noted that several times in the in the oral decision and the government itself in the moving papers where they indicated that they were going to call the the Ms. Mendoza as a first witness, the husband as a second witness. And then if they pass that hurdle, they would call the the government officers. They basically indicated that. So there should be absolutely no question that we made a prima facie case of duress and coercion on the declaration. Now, the only thing we did not do is testify. Right. Because that's the essential holding of the immigration judge is that she didn't testify. Therefore, she can't sustain her duress and coercion claim based on the declaration alone. So now we look at the case law with respect to the requirement that there must be testimony in addition to a sworn declaration. So the only case on earth that says that you must testify is the BIA case of Barcenas. OK, so if we if we take a look at Barcenas, there is absolutely no analysis or reasoning in that case whatsoever. So there is absolutely no Chevron deference on that case. And so we must take a look at the facts of that case as to why they came up with that that holding. So if you look at the facts of that case, first of all, that that case involved an alien who was not a lawful permanent resident of the United States. He stated his name on the record, date of birth and his parents names. And then he took the fifth. So he didn't file a declaration alleging any untrustworthiness, unfairness, duress or coercion. In fact, the the Barcenas court, you know, chastised him, said he offered no evidence to even suggest that the contents of the form did not relate to the respondent, that the information was erroneous or that or that it was a result of coercion or duress. So he made absolutely no no allegations whatsoever, either in declaration or orally. So and in that case, it's important to note that the I-213 was introduced and the author, the officer, the officer testified at length in that case as to the circumstances of the arrest and what have you. So that officer was available for cross examination by the alien's attorney. The government cites two other cases indicating that the Ninth Circuit has approved Barcenas. If you look at those other cases, Sanchez, V. Sessions, Armas, Barenzuela and Perdomo, none of those cases analyze Barcenas whatsoever. None of those cases. In none of those cases is is do they say that a person has to testify in addition to a declaration? None of those. So the only case that says that you must testify is Barcenas. But again, if you look at the facts of Barcenas, it's absolutely there's absolutely no analysis whatsoever. And and quite interestingly, if you look at the three cases cited by the government, Sanchez, Armas, Barenzuela and Perdomo, the Ninth Circuit seems to ask that Barcenas be challenged. They all they all basically say, hey, nobody's challenged Barcenas. So we're we're taking it at face value. Counsel Judge Gould, if I could interject my question for your time is all used up. One of the things on my mind was assuming that she did not have to provide testimony in addition to her declaration. To raise an issue on coercion, what does the record show as to what she did when she and her husband drove up to the border with a person inside the car who had no right to be in the US? I don't understand the question, Your Honor. How did she have that information? So what did what did she do? That she was nearing the border. OK, she was a passenger in that vehicle, Your Honor. And if you want to get to the point of whether there was an affirmative act, I can I can address that as well. But I'd like to finish up on my Barcenas analysis, Your Honor. Again, the Ninth Circuit is is basically asking somebody to challenge Barcenas. If you look at those three cases, they are all basically questioning Barcenas. And if you look at Armis Barenzuela case, it's actually striking that the court in that case was actually upset at the government for not calling the government witness. It basically said, as I quote, the parties disagree as to whether the government's decision not to examine Agent Lawton during proceedings was a tactical decision on the part of the government or simply relies on Barcenas. If the government made a tactical decision not to produce Agent Lawton, it might not be entitled to a second bite at the evidentiary apple on remand. I think that is very telling. With respect to the actual, we did file an affirmative defense to the alien smuggling, even in the event that the documents would come in. Your Honor, if you look at the actual facts indicated in the I-213 and Record of Sworn Statement, if you look at those allegations, all there is is the Ms. Mendoza asked the child alien what his name and date of birth was. That's it. One question. One question. They asked her if she was practicing and rehearsing with the illegal alien. She said no. Now, the judge and the BIA made a lot of inferences based on that one question. Again, but one question cannot be practicing and rehearsing. I've never heard of practicing and rehearsing. Counsel, Judge Gould again with this question. If she asked his name and he said a name different than the name she knew was his name, what does that signify? It signifies nothing, Your Honor. In terms of an affirmative act, it signifies nothing. She asked one question. Now, she stated, why did you ask that question? To see if he was nervous. Now, based on that answer, the judge and the BIA inferred many things that she was practicing with him, that she would not have gone through with it if he did in fact sound nervous. But giving the explanation that she wanted to know if he was nervous, that is a thought, Your Honor. That's not an act. That is not an act. The only act alleged here is that she practiced and rehearsed with the illegal alien by asking him one time what his name was and date of birth was. That is not practicing and rehearsing. Counsel, what did he say his name was? I don't know what he said, but the key question is that one question does not equal, does not amount to practicing and rehearsing. Now, if the government wanted to clear any of this up, they should have called the officers to testify. They want to make this inference that she practiced and rehearsed with him, did it more than once, then they had the burden of bringing the officers to testify. Your Honors, it's time for the Ninth Circuit to take a real close look at Varsanas and give us a real analysis of that case. I would submit on that. Okay, Mr. Garcia, your time is expired, but I'll still give you an extra three minutes to make a rebuttal argument after Mr. Schultz has completed his argument. And if he needs an extra couple of minutes, also, we'd give him that. So why don't we turn to Mr. Schultz? Thank you. Thank you, Your Honor. Just a technical question. Can you hear me okay? I just want to confirm. I can hear you very clear. Thank you, Your Honors. I'd like to pick up on a couple of the points that Your Honors raised. First of all, to pick up on what Judge Owen said, both in the 2012 hearing and the 2014 hearing, as far as the record shows, the petitioner simply declined to call any witnesses. Specifically in the 2014 hearing, the immigration judge made clear that the board had extended an invitation to the petitioner to call witnesses. And when the immigration judge made that explicit, what the petitioner did is she declined to call anyone, and she closed her case. Now, she could have called anyone, literally. She could have called her mother-in-law, who was in the car. She could have at least tried to have called the officer. She didn't even make that effort. If you look at the petitioner's brief, I think it's on page 23 of his brief – 24 of his brief, I'm sorry. That's where he claims that the officers were nowhere in the court. He then cites the record at pages 103 and 106. The record on those pages does not talk about whether the officers were or were not in the court. The record is simply silent. What we do know from the record is that the petitioner had the option to call anyone, including the officers, and didn't. That means that there's no prejudice here. What would have happened if she had said, I want to call the officers? Would that have been permitted under Barsanis? Well, I suppose the way to look at it, Your Honor, is we'll never know. She didn't do that. To give a slightly longer answer, the board eventually came out and said that there is no right to call an officer. But in the trenches at that moment, back in 2012 and 2014, especially 2014, the immigration judge, as far as we know, might have let them testify. We don't know. So the short answer is we don't know. And the longer answer is that's why it would have been helpful for her to have gone ahead and made that request to call witnesses. She simply didn't. Constitutional violations require prejudice. Simply put, that's an independent reason for the documents to be excluded. I'm sorry, that's an independent flaw in her argument that the documents should be excluded. That alone is a reason for the documents to come in. Without a prejudice, without prejudice, there's no constitutional violation. There's a second. Is it the government's position that under Barsanis, if the alien calls the immigration officers to testify, that they have to be allowed to testify? No, actually, Your Honor, that's not the position. Barsanis, I think, is a little bit less explicit on that than the Espinoza decision. But this sort of circuit held that there's no automatic right to call government witnesses. And that goes back to the reasoning both in Espinoza and that the Supreme Court put out in the Lopez Mendoza case where it discusses the burden on the agency. I thought Your Honor was going to say something. I apologize. Thank you. Thank you, Your Honors. There's a separate and independent reason that the document does have an independent flaw in the arguments that petitioners make, which is simply about whether there was an egregious Fourth Amendment violation at all. Now, I'm not asking this court to go ahead and decide that question. Now, I simply want to point out that it's not a Fourth Amendment violation that she's alleging. My understanding is that there's a due process and a Fourth Amendment violation, both. But it's a Fifth Amendment. I don't know what the Fourth Amendment would be. It was a stop at the border. She's claiming that the reason she couldn't testify and wouldn't testify when she was called by the government was because she would incriminate herself. That's part of what she's saying. She's also claiming she was coerced, Your Honor, is my understanding. Well, yeah. Well, that's the coercion. That's her argument as to why the statement shouldn't be used. But the basis of coercion is that it was a due process violation because the person was coerced. Due process is absolutely part of the claim that I understand them to making, Your Honor. The point, though, again, that I was trying to get at is that there's nothing here where she puts forward any argument on why the alleged coercion that took place is in any way an egregious violation. This is something that this court has made clear is a multi-step analysis. For instance, in the Espinoza decision, it made that clear. First, there's a question of whether there's a Fourth Amendment violation at all. And second of all, if there's an egregious violation in Barsanis, in order for the information to be admitted, there needs to be a showing of egregious violation, again, in the Espinoza decision. And that's simply not something that she made forward. I think before Miranda, at least, the initial view was that coerced confessions were not admissible because they were unreliable. She, if you believe what she says in the affidavits, they made all sorts of threats with respect to not seeing her children and promises that if she confessed that nothing would happen to her. Those were, I don't know what, in the context of a Fifth Amendment or a coercion claim, what would egregious be? Well, Your Honors, that's a quick point. The specifics she actually mentioned in her reply brief, the details weren't in the opening brief. But even given that, the overall point that I was trying to get at is that her brief simply doesn't have argument on this at all. It doesn't have legal analysis. It's simply missing in the opening brief. That then leads to the third point, which— Would the government have tried to cross-examine her about the underlying facts or just with respect to her allegations involving why it was coerced? I'm sorry, Your Honor, I'm not sure I understand the question. Suppose she testified. And what would the nature of the cross-examination have been? Would it have touched upon what she did, the actual facts? Or would it have touched upon her claims regarding what the agents did to coerce the testimony? We don't know, Your Honor. She pled the fifth, so I can't say what the DHS lawyers would have cross-examined that. What we do know is that because she did not testify, there was no ability to test the questions and test the assertions that she put forward in her declaration. To get to the third point, which is I think what much of opposing counsel's argument centered on, is Barsanis itself and whether or not her failure to testify is itself a reason for the documents to be admitted, for her confession to be admitted. And I think that this is a perfect example of the benefits of testimony. Her declaration here contradicted – well, she had two declarations here. They're very similar, but they essentially contradicted themselves. They said, I didn't say something, but if I said it, then it was coerced. She never actually – to go to Judge Kuhl's point – she never actually talked in her declaration about what she did when she was in the car. She never talked minute-by-minute about what happened. She didn't specifically – If she had done that, arguably, she might have said something that would have incriminated her. Well, that's always true of the declaration that she put forward, Your Honor. That could have been true of what she did already. But the point being that there's nothing there in this declaration that has much substance to it, and that's precisely the sort of vanilla, fairly easy-to-put-out declaration that I think creates the sort of problems that cross-examination can fix. If she had testified, or if someone else had testified, if you want to move away from the Fifth Amendment violation problem, there's no need – the government isn't claiming that she herself needed to testify here, or even her husband. There was a mother-in-law in the car, an adult. Were there any other witnesses to the actual interrogation? Well, some of the problems that she – The short answer is it's unclear from the record, given what she wrote in the declaration. What she wrote in the declaration is that some of the things that she's claiming were coercion took place, potentially, in the sight of others. Definitely what happened in the car took place in the sight of others. There's at least some things that could have been asked about, even from a witness who wasn't her, on cross-examination after testimony. She was given the opportunity to do that here and simply passed it up. What about her argument that what she did did not constitute aiding and abetting? I think that there's less to that argument than meets the eye, Your Honor. As we discussed in the brief, there are cases that show that, while it's true, doing nothing is not something that triggers aiding and abetting. Here, if you look at the Form 877, which is the interview, then the Form I-213, which is the summary of the interview, it makes clear that she did something. What she did is that she asked him questions, and she said that she did so to make sure that he wasn't nervous. That's similar to the Paris case that this court decided, and it's also – that involved concealing someone in a car. It's also similar to the Garner case that we talked about, which isn't an immigration case, but this court's precedent says it's appropriate to look at criminal cases for aiding and abetting, where the idea of rehearsing, in that case, in a blackjack fraud instance at a casino, was enough to constitute aiding and abetting. She also, and now I'm quoting from the Ninth Circuit opinion, reluctantly acquiesced in her father's use of her son's birth certificate, close quote, to carry out the plan after her father threatened to stop assisting with mortgage payments unless the petitioner allowed him to use the birth certificate. And the Ninth Circuit ruled, and I quote again, we cannot conclude that petitioner engaged in an affirmative act by reluctantly saying yes to her father's repeated requests. Isn't that worse? Isn't that worse than what happened in this case? I disagree, Your Honor. I think that the key word in that and what the quote you just read is acquiescence. And here, the petitioner made clear that she didn't simply go along with what her husband had set up, but that she actively assisted in trying to make that happen. Think of it as quality control, Your Honor, if you don't like the word rehearsal. What she did was try to make sure that what the child said that his lies would pass muster and would be able to get through what an immigration officer heard. Maybe she could have done more, but what she did was enough. I would like to address one last point very briefly, Your Honor. Petitioner here mentioned whether there's any Chevron deference. That was really just a sentence or so in their brief on the question of deference. If that's the if that's a route that this court decides to go down, I suppose the main thing I would request is that you allow the parties to have some additional briefing on that point to put a finer nub on it or a finer point on it. She's arguing that this not allowing her to call the witnesses, the the immigration witnesses. It was a violation of her right to due process. That's right. But she also made a title that that ruling, if that's what Barstain is not entitled to. That argument does not provoke Chevron deference. I think we're going to the same place, Your Honor. What I was going to suggest, even though it's not in the briefs, is that there is a type of deference that applies there. It's the same type that the Supreme Court mentioned in the in the in the Connecticut Yankee in the Vermont Yankee case. And that is something that I would ask if the court is considering going down, down, down that route that allow the parties to offer some additional briefing on that on that issue. Since this is a process point, Supreme Court arguably would get that would give deference here. I see that my time is soon expiring. Are there any other questions that I can answer for the for your honors. No questions in my. I'm good. Thank you, Your Honors. Thank you, Your Honors. Thank you, Mr. Schultz. Mr. Garcia, I said I'd give you three minutes, so please. Thank you, Judge. If I may. Yes, Your Honor. First of all, the government says that Mendoza had an option to call the officers as witnesses. Where is where is that coming from? She's been wanting to cross examine those officers since 2012 and 2014. That's what this whole case is about. So that that she could just put them on a witness and say, I want to call these officers and they'll be available. That's ridiculous. Ridiculous. That's a ridiculous statement. The court asked what if she had testified, what would she have had to answer? It's and the answer, we have it here, Judge, on page administrative record one of four to one of five. Judge to Miss Mubaraki and government counsel, may we conclude that you will that you would ask a full panoply of questions regarding that particular incident? Yes, Your Honor. So that's what would have been asked in terms of the Fourth Amendment egregious violation. Number one, that's already been determined that that Mendoza made a prima facie case by the BIA. And as the court indicated, if you look at the her her allegations in her declarations, Judge, she was handcuffed. Her kids were handcuffed. Little kids were handcuffed. Mother-in-law was handcuffed. They're crying. They don't let her console her. The officer passes by, say, hey, you're a horrible mother. You're going to go to jail. The kids are going to be taken away from you at the interview. The officers are pounding the table. No, you don't. You're not getting it right. You're going to go to jail. Your husband's go to jail. I mean, that's egregious, in my opinion. With respect to calling the husband as a witness again, he was within this five year statute of limitations. So he had a right also not to testify. And the government said, well, the mother-in-law could have testified. The mother-in-law was not in the interview sessions where where all this duress and coercion took place. So she was not there. And I think the court pointed that out. And in terms of in terms of the actual alien smuggling, the government said that that that she asked the child illegal alien questions. No, the record is clear that she only asked one question. Again, the government tries to infer a lot of stuff. This just one question. It was not practicing. It was not rehearsing. And you cannot infer that. And again, if the government wanted to clear this up, it was on them to call the officers. The ball was in their court. And lastly, Judge, you know, this case comes down to, in my in my opinion, this is complete arrogance on the part of the government and how they handle these cases and who when they decide whether they're going to call the witnesses or not. They and this under Espinoza, it cannot be your honor. This is this would be an unfettered. It would give the government unfettered discretion whether to call a witness or not. And that's exactly what happened here. That cannot be. This case involves a lawful permanent resident of the United States facing the most serious immigration charge of all a lifetime ban from the United States. She deserves. How would she how would she have incriminated herself if she had testified just to what the agents told her that allegedly caused her to make these statements. And couldn't she have asked the judge to limit the cross to what she testified to? I don't see why it's necessary to get into the details of what she allegedly did. And in a in a search and seizure case, this it's it's a different issue because in order to establish standing, for example, you virtually have to admit that you possess the. Whatever it is, they seized. You truly have to incriminate yourself, but I don't see if how she's if she testified to what was in her affidavit. What the cross examination would have involved or could have involved, at least that wouldn't have been subject to an objection or maybe even a limited ruling. Well, that's OK. That's a fair point, Judge. But then the immigration judge should have should have should have said so. He should have he should have limited. He should have made an order limiting questioning to the duress and coercion. But it's clear that that was not the judge's intention and it was not the government witnesses intention. As I indicated, the government would ask a full panoply of questions regarding that particular incident. So the plan was to ask anything and everything regarding the incident, the duress and coercion and what have you. So if if if the court would have if the immigration judge would have limited questioning to that, then we might have a different case. But those are not the facts of this case, Judge. She could have asked the judge to limit it. The the accused should not be the first witness called the accused. We're talking about the accused, a lawful permanent resident of the United States should not be the first witness called. She's accused and facing possible criminal charges on an alien smuggling charge. The government witnesses should be the first witnesses called. So her asking, well, Judge, please let me only testify to this. It's clear what what what it's clear what the San Diego immigration.
judges: Gould, Owens, Korman